In the Matter of the Estate of HERMAN A. METZ, Deceased.

Surrogate's Court, New York County, March 8, 1940.

*Breed, Abbott & Morgan* [*William L. Hanaway, Hiram T. Thomas* and *Stoddard B. Colby* of counsel], for the administratrix *c. t. a.*

*Frueauff, Burns, O'Brien & Ruch* [*H. V. Beck* of counsel], for the Broadway Temple Corporation, objectant.

*Coombs & Wilson* [*James J. Milligan* of counsel], for the President and Directors of the Manhattan Company, objectants.

*Arthur J. Hilly*, special guardian for infants.

DELEHANTY, S.   Deceased was one of many persons who executed pledge cards in a campaign to raise money for the purposes here-

inafter detailed. The campaign was conducted under the auspices of a notable religious leader in this city. The projected plan had as its major purpose the erection of a large central building towering above the other structures in the vicinity. At the street level there was provision for a large church auditorium with a very large hotel apartment structure above. The entire program contemplated the erection of two substantial apartment houses on either side of this main structure. The whole group of buildings was to be operated as a unit in the expectation that a sufficient revenue from the real estate occupancies would be derived so as to carry the cost of the church proper and enable the use of substantial surplus moneys in the charitable work which the entire plan contemplated would continue indefinitely from and after the completion of the project. The signers of the various pledges undoubtedly hoped to secure a continuously available stream of money for use in religious and charitable work. They were not engaged in a real estate speculation and had no prospect of personal profit out of the enterprise or by reason of their contributions.

Whether the cost of the entire enterprise had been misconceived or whether it had been made impossible of completion by the depression which has afflicted the country for the past ten years is not entirely clear on the record. It is clear, however, that the enterprise as originally envisaged and supposedly capable of completion by the use of the moneys pledged by deceased and others has failed and that it cannot now be carried out even if all the pledgors were to fulfill their pledges completely. The major and central structure is still to be built. Nothing of it exists except its foundations, its basement space and some comparatively unimportant members of the steel framework protruding above the now roofed-in basement space. A new program of money-raising is under way. The plan for the central structure has been enlarged by an increase in number of stories and by some other substantial modifications of exterior appearance. Whether the project can ever be completed as it is now projected or even as the lesser plans were projected originally remains a matter of doubt. But if completed at all it will only be at a cost far in excess of the original projected cost.

Deceased pledged a contribution of $10,000. In his lifetime he paid $5,000 of the amount pledged. His estate is now asked to pay the balance. The issue of estate liability arises on objections filed to the account of the executors and to the rejection of the claim for the balance. Such objections are overruled and the claim held to be without legal basis.

There is here existent a state of facts not contemplated by the parties to the original money-raising program. Nothing was provided for in the arrangements between the parties which covers the state of facts now existent and existent at the date of deceased's death. On both sides it was assumed that the original program could be financed on the original basis. Neither side had any thought of the developments which made the planned program impossible of completion. There has been a frustration of the purposes of the parties. Such a frustration operates to terminate the liability of deceased under his pledge.

The doctrine of frustration has been given extended consideration in the English courts. It was outlined by Viscount HALDANE in the case of *Tamplin Steamship Co., Ltd., v. Anglo-Mexican Petroleum Products Co., Ltd.* ([1916] 2 A. C. 397, 406, 407). Lord HALDANE said: " The occurrence itself may yet be of a character and extent so sweeping that the foundation of what the parties are deemed to have had in contemplation has disappeared, and the contract itself has vanished with that foundation."

In the later case of *Larrinaga & Co., Ltd., v. Societe Franco-Americaine, etc.* (39 T. L. R. 316, 318), Viscount FINLAY said: " When certain risks are foreseen the contract may contain conditions providing that in certain events the obligation shall cease to exist. But even when there is no express condition in the contract, it may be clear that the parties contracted on the basis of the continued existence of a certain state of facts, and it is with reference to cases alleged to be of this kind that the doctrine of ' frustration ' is most frequently invoked."

A further development of the doctrine is found in the case of *Tatem, Ltd., v. Gamboa* ([1939] 1 K. B. 132). There GODDARD, J., said: " But it seems to me, with respect, that, if the true doctrine be that laid down by Lord HALDANE, frustration depends on the absolute disappearance of the contract; or, if the true basis be, as Lord FINLAY put it, ' the continued existence of a certain state of facts,' it makes very little difference whether the circumstances are foreseen or not. If the foundation of the contract goes, it goes whether or not the parties have made a provision for it. The parties may make provision about what is to happen in the event of this destruction taking place, but if the true foundation of the doctrine is that once the subject-matter of the contract is destroyed, or the existence of a certain state of facts has come to an end, the contract is at an end, that result follows whether or not the event causing it was contemplated by the parties. It seems to me, therefore, that when one uses the expression ' unforeseen circumstances ' in relation to the frustration of the performance of a

contract one is really dealing with circumstances which are unprovided for, circumstances for which (and in the case of a written contract one only has to look at the document) the contract makes no provision."

The Court of Appeals in this State seems to have applied the same doctrine of frustration and to have reached a comparable result in *Matter of Bond & Mortgage Guarantee Co.* (267 N. Y. 419). In ruling that a mortgage guaranty company could no longer insist upon the benefit of a servicing contract when concededly it could no longer perform its own contract of guaranty if occasion arose for such performance, the court said (p. 425):

" The rehabilitator stands upon a strict construction of particular terms of the policy, but it is obvious that the policy was never intended to answer the question here presented.  *  *  *  It is a mere fiction to say that the parties actually intended anything in so unforeseen an emergency.

" While courts ' neither make nor modify contracts nor dispense with their performance ' (*Cameron-Hawn Realty Co.* v. *City of Albany*, 207 N. Y. 377, 381, 382), it is no longer true that the scope of an undertaking is necessarily to be fixed in absolute accordance with the literal meaning of the language used.  (3 Williston on Contracts, § 1931; *Buffalo & Lancaster Land Co.* v. *Bellevue Land & Improvement Co.*, 165 N. Y. 247; *Day* v. *United States*, 245 U. S. 159.)  Further performance of the form of this policy is still possible, but that is not the test of the right of the bank.  The basis on which the policy was entered into has been removed, and the value of the guarantee impaired, by the force of uncontrollable supervening events."

On the basis of the quoted authorities the court dismisses the objections of Broadway Temple Corporation and holds that its claim is not a valid claim against the estate.

A second objectant seeks payment now of a substantial sum of money alleged to be due it by the estate by reason of guaranties of the deceased.  Certain concessions were made on the hearing which reduced the controversy between the parties to the question whether the estate is obliged now to pay $62,706.06, with interest. In brief, the estate representative asserts that the estate has been wholly discharged by reason of certain transactions and omissions of objectant in respect of security held by objectant for the debt which deceased guaranteed.  It is argued by the estate representative that the claimant must now look wholly to the security.  It is argued by the estate further that if this position is held untenable no money may be ordered paid to the claimant at this time since the security has not been liquidated and since such liquidation is a

condition precedent to the right of payment out of the estate. The record presents a subsidiary question whether the estate has been discharged from liability *pro tanto* because of conduct of the objectant in disposing of funds which came into its hands by reason of its possession of mortgage collateral. A recital of the steps taken in the various business transactions in which deceased participated and which eventuated in the state of affairs existent when deceased died would be too lengthy for inclusion in this decision and its detail would be of no special interest. The court holds that the guaranties of deceased were guaranties of payment and not of collection. The court holds that the transaction under which the creditor bank took the mortgage collateral was not violative of any public policy and did not alter the obligation of deceased to the bank. The court holds that under the contract between the parties the bank was under no obligation to take affirmative steps to foreclose the mortgage collateral. The court holds that the true intent and purpose of the parties was to constitute the mortgage collateral security first for the bank and secondly for the deceased. The court holds that, except for the transactions hereinafter discussed, the handling of the collateral by the bank was entirely consistent with its obligations to deceased in respect thereof and constituted no basis for discharge or release of deceased's obligation. In particular the court holds that the handling of the condemnation award caused no prejudice to the rights of deceased but, on the contrary, was a protection to deceased which left him in as favorable a position in respect of the collateral as his contract with the claimant entitled him to occupy.

While the bank creditor did not resort to the collateral for payment of its obligation during the lifetime of deceased, it did take an assignment of the rents after deceased's death. Under that assignment it received substantial sums of money. Complaint is made by the estate respecting the application of such funds. So much of the complaint as is based on use of the funds to pay arrears of taxes and the like is held by the court to be without basis. In so applying the money the bank creditor was preserving the value of the collateral.

However, the bank made payments aggregating $3,500 which the court finds to constitute direct prejudice to the estate. While the bank was under no obligation to foreclose the mortgage, it could not without *pro tanto* discharge of the estate make any use of the rent moneys in its hands except for protection of the collateral or for payment on account of its debt; $500 of the total of $3,500 was paid to an officer of the corporation whose property was security for the mortgage, ostensibly for alleged services of that officer in

the procurement of a lease of the property. The balance, $3,000, was paid to the same officer ostensibly for back salary. It would seem from the proof that this payment was designed to reduce the taxable income of the corporate owner of the land. When received by the corporate officer the $3,000 was loaned by him back to the corporation and, in fact, was used for the payment of taxes and the like. Both the bank creditor and the corporate officer seem to have regarded the transaction as only a formal alteration in the bank's handling of the funds. They did not intend any detriment to the interests of the estate. Nevertheless, it is plain that there was a material change in the situation. The money passed out of the possession of the bank creditor in its character as mortgagee. It came back, it is true, but only as a loan made by the corporate officer to the corporation.

After the bank took the assignment of rents and received moneys under it it had in effect two sorts of collateral. One was the mortgage; the other the cash. When it released the cash collateral it released part of the security and brought itself within the operation of the rule declared in *Vose* v. *Florida Railroad Co.* (50 N. Y. 369) — a case cited by the Appellate Division in this department for the proposition that a " creditor releasing security for his debt discharges the * * * surety to an amount equal to the value of the property released." (*Cohen* v. *Rossmoore*, 225 App. Div. 300, 305.) Since the property released was cash there is no need for proof of value. To the extent of $3,500, therefore, the obligation of the estate was released.

However, the transaction did not operate to release the estate entirely. While this State adheres to the strict rule respecting a surety's obligation it applies the rule only where there has been an alteration of the principal's obligation. " By ' alteration ' in the obligation of the principal, the principal is discharged from performance of the obligation in its original form and, in effect, a new obligation is substituted for the old. In those cases where we have held that alteration of any kind in the obligation of the principal discharges the surety, there has been a change in the nature of the obligation which might be required of the principal; performance of the old obligation might be more onerous but relief from the burden of the old was accompanied by the creation of rights and duties different from those which arose out of the original agreement. We have in such cases refused to balance the advantage of relief from the old burden against possible disadvantage imposed by the new. We have held that the surety is discharged by any modification of the contract of the principal which requires of him performance in any respect different from the performance guar-

anteed by the surety. We have not held that an act of leniency towards the principal by the assured through remission of a part of an obligation or waiver of full performance constitutes an *alteration* of the obligation of the principal which will discharge the surety completely." (Italics in original.) (*Becker* v. *Faber*, 280 N. Y. 146.)

It is the general rule that a surety must pay the debt and himself resort to the collateral. Under that rule the claim of the objectant bank must be sustained to the extent of the amount in controversy reduced by the sum of $3,500 — plus the sums admittedly due. This payment will vest the estate with the right to take the collateral, but subject to the residual right therein of the objectant bank to recoup the $3,500 difference if and when the estate is made whole for its outlay.

The proposed apportionment of taxes is approved. The appointment of the proposed substituted trustee will be made upon the filing by it of the appropriate consent.

Submit, on notice, decree directing payment and settling the account in accordance with this decision.